Filed 1/30/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| RICHARD NEWMAN, as Executor, etc.,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>MARINA CASEY,<br><br>　　　Defendant and Appellant. | A165210<br><br>(San Mateo County<br>Super. Ct. No. 22PRO00138) |

This is an appeal from elder abuse restraining orders (EAROs) issued pursuant to Welfare and Institutions Code section 15657.03[1] and a subsequent order declaring a deed transferring property owned by Gracia Bovis to her daughter, Marina Casey, void ab initio. Casey challenges the restraining orders as not supported by the evidence. She challenges the order declaring the deed void on the additional ground the trial court exceeded its authority under section 15657.03. We conclude sufficient evidence supports the restraining orders, but agree the court exceeded its statutory authority in issuing the subsequent order declaring the deed void. As we explain, section 15657.03 establishes a summary and initially provisional remedy to secure the immediate protection of elders from further abuse. The statute expressly enumerates the kinds of restraining orders the court may issue, and in some situations, a restraining order, alone, may provide an elder a sufficient

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

remedy.  In other situations, it may not, and, in such situations, the summary restraining order process serves as an important adjunct to a civil or probate action for elder abuse under the Elder Abuse and Dependent Adult Civil Protection Act (§ 15600 et seq.) (Elder Abuse Act or the Act).  We therefore affirm in part and reverse in part.

## BACKGROUND

In February 2022, Bovis filed a "Request for Elder or Dependent Adult Abuse Restraining Orders" on Judicial Council form EA-100.[2]  She described the alleged abuse as follows: "[She] was misled by her daughter that she needed to protect her home from rising property taxes.  Marina Casey, her daughter, told her mother to sign some documents last year or else her property taxes would skyrocket.  Bovis later learned that the documents did not protect her from rising property taxes, but instead transferred the property into her daughter's name."

Bovis requested (by checking the appropriate box on the form) a "Personal Conduct Order[]" that Casey "not to do any of the following things" to Bovis: "Physically abuse, financially abuse, intimidate, molest attack, strike, stalk, threaten, assault (sexually or otherwise), hit, harass, destroy the personal property of, or disturb the peace of the person."  (Boldface omitted.)  She also requested (by checking the appropriate box) a no contact order instructing that Casey not contact Bovis "either directly or indirectly, in any way, including but not limited to, in person, by telephone, in writing, by

---

[2]  Section 15657.03, subdivision (y)(1) states, "The Judicial Council shall develop forms, instructions, and rules relating to matters governed by this section.  The petition and response forms shall be simple and concise, and shall be used by parties in actions brought pursuant to this section." (See Cal. Rules of Court, rule 3.1160 [augmenting procedures set forth in statute].)

2

public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means." (Boldface omitted.) She additionally requested (by checking the appropriate box) a "Stay-Away" order requiring Casey to stay at least 100 yards away from Bovis and her home. In another section of the form, she requested an "Additional Order[]" requiring Casey "to sign the rescission deed to return her home to her" and attorney fees. (Boldface omitted.)

Casey filed a "Response to Request for Elder or Dependent Adult Abuse Restraining Orders" on Judicial Council form EA-120. As permitted by the form, Casey attached a declaration by her attorney. Counsel averred as follows: The transfer "was made because of Proposition 19, and to avoid reassessment of property that would otherwise be trigged by an intergenerational transfer." Proposition 19 "added new restrictions" on change of ownership and "prompted a rush on parent-child transfers to beat the deadline for filing reassessment exclusion forms on or before February 15, 2021."

The following were attached to counsel's declaration as exhibits: a copy of the grant deed transferring the property from Bovis to Casey as a gift from parent to child;[3] a copy of Bovis's will dated February 6, 2020; and a copy of "the Second Amendment to the Survivor's Trust under the Revocable Trust Agreement of James N. Bovis and Gracia Bovis dated February 18, 1997," executed on February 6, 2020.

These documents, according to counsel, effectively disinherit Bovis's son. For example, the will provides that all household goods and personal property are to be given to Marina Casey and makes "no provision herein for Nicholas J. Bovis, my son." (Boldface & some capitalization omitted.) The

---

[3] The deed was recorded February 8, 2021.

3

will also nominates Marina as the executor of the will. The second amendment to the trust reads, "At the time that this Declaration of Trust is executed, the Settlors have two (2) children living: Nicholas J. Bovis and Marina V. Casey, both of whom are adults. The Surviving Settlor intends to make no provision in this trust for Nicholas J. Bovis, in that, in the Settlor's view, Nicholas J. Bovis has certain criminal issues and the Settlor does not wish provide [*sic*] any financial support or distribution to him as a result.[4] All remaining property in the trust shall be allocated and distributed to Marina V. Casey, outright and free of trust, if she is then living, and if not, to her issue by right of representation." (Boldface & some capitalization omitted.)

Counsel additionally averred that Bovis's son had started spending significant time with his mother. Casey was concerned he was exercising undue influence over Bovis and had convinced his mother to seek return of the property so he could use it for "improper purposes," as he had previously done in connection with "other properties that belonged to his mother." Also attached to counsel's declaration was a "draft-copy of The Gracia Bovis Irrevocable Trust, showing redline edits made" by counsel's law firm to transfer title of the residential property to the trust and place management in the hands of an independent, professional fiduciary to ensure no undue influence by Bovis's son. Bovis's attorney had not agreed to management by a professional fiduciary, and Casey and Casey's counsel were concerned this was due to pressure by Bovis's son.

The hearing commenced remotely with only Bovis and her attorney present. Bovis proceeded to testify as follows: She had lived in her house for

---

[4] Counsel declared he had read in a bulletin issued by the United States Attorney's Office that Bovis's son had been convicted of wire fraud.

4

over 50 years.  Her daughter, Casey, "tricked me into signing papers" so she "would not get higher taxes" under Proposition 19.  When Casey presented the documents to Bovis to sign, she did not tell her the home would no longer be in her name.  Bovis admittedly did not read the documents.  She later discovered the documents transferred title to Casey.  Casey had threatened to put Bovis "in an old folk's home,"[5] and Bovis had been receiving voicemails from realtors and was concerned Casey was trying to sell her home.  She "had quite a difficult relationship" with Casey, and Casey was "abusive to me."  Bovis wanted Casey "out of my life," and she wanted her house back.

When the court asked Bovis why she had not read the documents, Bovis stated, "There was so much confusion going on in this matter discussing this, and I just trusted her.  It wouldn't have entered my mind that she would do anything like that.  So she said to sign the papers so I would [not] get higher taxes. . . .  It was confusing for me."  Casey only discussed the situation with her "one time."

Just as Bovis finished testifying, Casey and her counsel were connected to the hearing.  The reason for their delay in appearing was that the notice of hearing stated the matter would be heard in a different department, and when it became apparent the hearing was not going to be held in that department, counsel had to work remotely through the clerks to get electronically connected into the proper department.  The court deemed this a reasonable explanation for the tardy appearance and continued the hearing to the following week.

In light of Bovis's testimony that she had received telephone calls from realtors, her attorney asked that temporary restraining orders be extended until the continued hearing and that they include a prohibition on Casey

---

[5]  Bovis was not clear as to when Casey made this asserted threat.

taking any steps to sell or encumber the property. Casey's counsel denied that Casey was doing any such thing and stated her efforts, at his instruction, were focused on transferring the property into a trust and arranging for management by an independent, professional. "I advised her not to undo the status quo for now until we can work this out in a way that protects the property from Nick Bovis."

The court extended the temporary restraining orders with the additional prohibition that Casey "take no action whatsoever to encumber the property," and that Casey "have no communication with any realtors," "with any mortgage broker, with any lender as it relates to this particular property."

On cross-examination during the resumed hearing, Bovis conceded she signed the deed conveying her property to Casey but maintained Casey told her "to sign papers so I would not get taxed." Casey selected the attorney, and she and Bovis went to his office. The attorney did not explain to her that she was "deeding the property to Ms. Casey." The attorney "had his daughter with him at the time. It just seemed that everybody was talking at the same time. And I just probably didn't pick up what was going on in the room and what they were discussing." She thought the attorney was Casey's attorney but could not recall whether she wrote a check to pay him and stated, "All I know is Marina was in charge of this whole transaction." She did not know if the attorney had the deed recorded. It was never her "intention to give [her] house to [Casey] during [her] lifetime."

Casey also testified. She discussed Bovis's estate planning documents and asserted she had not pressured Bovis to execute the Second Amendment to the Survivor's Trust. Rather, Bovis and Bovis's attorney had "put it together." Nor did Casey pressure her mother into signing the transfer deed.

6

Rather, she and Bovis "were talking about it because of Prop 19, and my—we thought that it would be a good way to protect the asset for my brother and I, and that's all it was."

Casey was referred to an attorney—a different attorney than the one who prepared the second amendment to the trust—to prepare the transfer deed. She twice took Bovis to this attorney. During the first meeting, the attorney spoke about "[m]oving the house out of [Bovis's] name" to "protect the Prop 13 property tax base." He explained to Bovis she "would be transferring the property to" Casey and Bovis "would no longer own the property." During the second visit, Bovis signed the deed. Either the attorney or his daughter prepared the document and presented it to Bovis for signature. When they did so they "told her she would no longer own her home." Bovis asked questions, but Casey could not recall any specifics.

Casey denied "confusing" Bovis into signing the deed. She maintained Bovis "knew the house was in my name for over a year," and the accusation of Casey "tricking her" only started when her "brother said he found out accidentally that the house" was in Casey's name. She stated Nick had sent her a text "accusing" her of "making my mother do it." And it "was only after [Nick] made this accusation that [Bovis] starting accusing" her.

Casey acknowledged Bovis asked her to "return the house" a "number of times." She did not do so immediately because she "was worried about the tax implication of putting it back" and wanted to "find counsel" for advice. After she located counsel (who was representing her in the EARO proceeding), he advised her "to put [the property] into a trust agreement." Her attorney drew up documents regarding a transfer of the house back to Bovis through an irrevocable trust and sent them to Bovis's attorney. Casey was "waiting for my lawyer to tell me when I can sign it." She acknowledged

7

she had been presented with a "recission," which Casey forwarded to her attorney because she had questions "about the tax implication, and I wanted to make sure it was going to be okay."

After hearing argument by counsel, the trial court found Bovis had met her burden "by clear and convincing evidence for the issuance of a restraining order."[6] "It is clear," said the court, that Bovis "did not understand fully what was ongoing when she signed the deed. She was taken to the attorney's office by Ms. Casey. Ms. Casey selected the attorney. And Ms. Bovis's responses to many questions throughout the course of this hearing are demonstrative of her confusion over a variety of issues." The court ruled the case involved "solely financial abuse unaccompanied by force, threat, harassment, intimidation, or any other form of abuse" and issued restraining orders on Judicial Council form EA-130 with a stated expiration date of two years.[7] (Boldface omitted.)

By checking the appropriate box, the court issued "Personal Conduct Orders" that prohibited Casey from, among other things, financially abusing or contacting Bovis (see p. 3, *ante*), as well as from "encumber[ing] financially the property." It also issued, by checking the appropriate box, a "Stay-Away Order[]" prohibiting Casey from coming within 100 yards of Bovis or her home. (Boldface omitted.) At the end of the form, the court added it would "consider adding an order that [Casey] sign a recission deed after briefing

---

[6] While not an issue on appeal, we note this is not the correct standard of proof under section 15657.03; rather, the standard is preponderance of the evidence. (§ 15657.03, subd. (b)(5)(A) [restraining order may issue "on a showing of good cause"]; *White v. Wear* (2022) 76 Cal.App.5th 24, 35 (*White*) ["The level of proof required for a protective order under the Elder Abuse Act is a preponderance of the evidence."].)

[7] A court has discretion under section 15657.03 to issue restraining orders of up to five years' duration. (§ 15657.03, subd. (i)(1).)

8

and argument by counsel." (Capitalization omitted.) It further ordered "Mandatory Entry of Order into CARPOS Through CLETS" by the close of business of the date of the order. (Boldface omitted.)

Casey thereafter filed a request for reconsideration, objection to issuance of the EAROs, and briefing on the authority of the court to order recission. Bovis, in turn, abandoned her request for recission and, instead, maintained the "simplest way" for the court to order the remedy sought— transfer of the property to Bovis— "is a court order to void the transfer deed ab initio." After hearing argument, the court denied reconsideration, stated it was going to order "Ms. Casey return the property to Ms. Bovis; that she do so within . . . 30 days of today's date," and issued a written order stating "Casey's possession of title is ongoing elder financial abuse that must be enjoined. Therefore, the court hereby orders the transfer deed void ab initio."[8]

## DISCUSSION

### *The Restraining Orders*

Under the Elder Abuse Act, a trial court may issue a restraining order to protect an "elder" who has suffered "abuse" within the meaning of section 15610.07. (§ 15657.03, subds. (a), (b).)

Section 15610.07 defines " 'Abuse of an elder' " as including physical or mental abuse, neglect or abandonment, or financial abuse as defined in section 15610.30. (§ 15610.07, subd. (a)(1), (3).)

Relevant here, " '[f]inancial abuse' claims are authorized in the Elder Abuse Act by section 15657.5, which works hand-in-hand with a set of defined terms in sections 15610.30 and 15610.70. As provided in Section

---

[8] The court's order declaring the deed void was not on a form EA-130 order approved by the Judicial Council.

9

15610.30, subdivision (a), ' "[f]inancial abuse" of an elder . . . occurs when a person or entity does any of the following:  [¶] (1) Takes, secretes, appropriates, obtains, or retains real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.  [¶] (2) Assists in taking, secreting, appropriating, obtaining, or retaining real or personal property of an elder or dependent adult for a wrongful use or with intent to defraud, or both.  [¶] (3) Takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining, real or personal property of an elder or dependent adult by undue influence," ' as defined in section 15610.70." (*Mahan v. Charles W. Chan Ins. Agency, Inc.* (2017) 14 Cal.App.5th 841, 856 (*Mahan*).)

"Section 15610.30, subdivision (c) defines the phrase '[t]akes, secretes, appropriates, obtains, or retains' as occurring 'when an elder or dependent adult is deprived of any property right, including by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly or by a representative of an elder or dependent adult.'  Section 15610.30, subdivisions (a), (b) and (c), together, define the requisite level of culpability broadly.  The defendant will be liable for 'depriv[ation]' (§ 15610.30, subd. (c)) of an elder's property that is taken 'for a wrongful use or with intent to defraud' (*id.*, subd. (a)(1), (2)), *or* that is committed by 'undue influence' (*id.*, subd. (a)(3))." (*Mahan, supra,* 14 Cal.App.5th at pp. 856–857.)

"The terms 'wrongful use' and 'undue influence' are specifically defined as well.  'A person or entity shall be deemed to have taken, secreted, appropriated, obtained, or retained property for a wrongful use if, among other things, the person or entity. . . knew or should have known that this conduct is likely to be harmful to the elder or dependent adult.' (§ 15610.30,

10

subd. (b).) ' "Undue influence" means excessive persuasion that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity.' (§ 15610.70.) The test for 'undue influence' is governed by a series of listed factors, including the 'vulnerability of the victim' (§ 15610.70, subd. (a)(1)), the 'influencer's apparent authority' (*id.*, subd. (a)(2)), the 'actions or tactics used by the influencer' (*id.*, subd. (a)(3)), and the 'equity of the result' (*id.*, subd. (a)(4))." (*Mahan, supra,* 14 Cal.App.5th at p. 857.)

A protective order "may be issued under [the Elder Abuse Act], with or without notice, to restrain any person for the purpose of preventing a recurrence of abuse, if a declaration shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse of the petitioning elder or dependent adult." (§ 15657.03, subd. (c).) Thus, an elder abuse protective order "may issue on the basis of evidence of past abuse, without any particularized showing that the wrongful acts will be continued or repeated." (*Gdowski v. Gdowski* (2009) 175 Cal.App.4th 128, 137.)

Generally, "the issuance of a protective order under the Elder Abuse Act is reviewed for abuse of direction [*sic*], and the factual findings necessary to support such a protective order are reviewed under the substantial evidence test. [¶] We resolve all conflicts in the evidence in favor of respondent, the prevailing party, and indulge all legitimate and reasonable inferences in favor of upholding the trial court's findings." (*Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1137–1138; accord, *White, supra,* 76 Cal.App.5th at p. 35.) Under the substantial evidence standard, the testimony of even one witness may support a finding based thereon. (See *In re Marriage of F.M. & M.M.* (2021) 65 Cal.App.5th 106, 119 [" 'The testimony of one witness, even that of a party, may constitute substantial evidence.' "];

*Plastic Pipe & Fittings Assn. v. California Building Standards Com.* (2004) 124 Cal.App.4th 1390, 1407 ["The uncorroborated testimony of one witness can constitute substantial evidence, unless the testimony is inherently unreliable."].)

In her appellant's opening brief, Casey obliquely indicates her mother has passed away. We confirmed this by examining the superior court's probate files, and on our own motion take judicial notice of Casey's petition for letters of administration in case No. 23PR000362. (Evid. Code, §§ 452, subd. (d), 459.) Thus, the restraining orders issued to protect Bovis from any further act of abuse are of no further practical effect, which would generally moot any appeal therefrom.[9] (See generally *Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 866 ["If the issues on appeal are rendered moot, a reversal would be without practical effect, and the appeal will be dismissed."]; 9 Witkin, Cal. Procedure (6th ed. 2023) Appeal, § 783 ["Where the order is rendered ineffective by the death of a party . . . , an appeal from it will be dismissed as moot."]; cf. *City of Monterey v. Carrnshimba* (2013) 215 Cal.App.4th 1068, 1078–1079 [expiration of permanent injunction renders appeal moot].)

However, neither party has raised the issue of mootness in connection with the restraining orders, and we shall exercise our discretion to decide the appeal as to those orders given that the same findings undergird both the restraining orders and the order declaring the deed void.[10] (See

---

[9] Moreover, here, it appears that under the estate planning documents Casey may be entitled to the property, and any dispute in that regard will be litigated in the probate court.

[10] We note that section 15657.3, subdivision (c) provides that "The death of the elder or dependent adult does not cause the court to lose jurisdiction of a claim for relief for abuse of that elder or dependent adult." This survival provision pertains to a civil action for elder abuse (see

*Environmental Charter High School v. Centinela Valley Union High School Dist.* (2004) 122 Cal.App.4th 139, 144 [a " 'discretionary exception[] to the rules regarding mootness' " is " 'when a material question remains for the court's determination' "].)

There is sufficient evidence in the record, largely Bovis's testimony, to support the restraining orders. Specifically, there is evidence of each of the four undue influence factors.

The first factor—the victim's vulnerability—may be shown by "incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew or should have known of the alleged victim's vulnerability." (§ 15610.70, subd. (a)(1).) Bovis was approximately 86 years old at the time of the events in question, and the trial court found she did not fully understand what she was told by Casey or the attorney who prepared the deed transferring title of her house to Casey. Bovis's testimony suffices to support the court's finding. As the court observed, Bovis's "responses to many questions throughout the course of this hearing are demonstrative of her confusion over a variety of issues."

The second factor—the "influencer's apparent authority"—may be shown by the influencer's "status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification." (§ 15610.70, subd. (a)(2).) Since Casey is Bovis's daughter, sufficient evidence supports a finding that this factor is present. (See *Keading v. Keading* (2021) 60 Cal.App.5th 1115, 1126 [second

---

discussion, at pp. 26–29 & fn. 16, *post*) and does not, on its face or in context, continue the enforcement of a restraining order issued under section 15657.03 following the death of the protected elder.

13

undue influence factor "readily satisfied" as the appellant was the elder's "only son and one of his care providers"].)

The third factor—the influencer's actions or tactics—may be demonstrated by the influencer's "[u]se of affection, intimidation, or coercion," or "[i]nitiation of changes in personal property rights, use of haste or secrecy in effecting those changes, [and] effecting those changes at inappropriate times and places." (§ 15610.70, subd. (a)(3)(A) & (C).) There is no dispute there was a change in Bovis's property rights, but Casey claims there is no evidence she engaged in any "nefarious 'tactics.' " However, Bovis argues there was urgency, or "haste," because of the Proposition 19 deadline and "inappropriate[ness]" because Casey made arrangements with an attorney other than Bovis's own estate planning attorney to handle the transaction. This certainly is not abundant evidence, but it is enough to support the trial court's implied finding on this point, particularly given Bovis's testimony that she was confused and felt pressured to sign the deed.

The fourth factor—the equity of the result—may be demonstrated by "the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, [or] the relationship of the value conveyed to the value of any services or consideration received. . . ." (§ 15610.70, subd. (a)(4).) The deed transferred title to Bovis's residential property as a "[g]ift from Parent to Child" and "[f]or no consideration." (Capitalization omitted.) Accordingly, Bovis was not financially compensated and incurred a financial loss as a result of the transaction. She also testified it was not her intent that Casey receive the property during Bovis's lifetime.

Casey maintains she did not take advantage of her mother and wanted only to ensure that her mother's estate would not be depleted by taxes. As her attorney observed, Proposition 19 "prompted a rush on parent-child

14

transfers to beat the deadline for filing reassessment exclusion forms on or before February 15, 2021," and according to Casey, the "transfer of the subject property was made because of Proposition 19, and to avoid reassessment of the property that would otherwise be triggered by an intergenerational transfer" after that date. She points out the deed transferring title was recorded seven days before the deadline. Casey could not remember how long before the deadline she discussed a transfer with Bovis, but she maintains she did so. She asserts there is no evidence she "engaged in . . . nefarious 'tactics,' " but rather, was a "dutiful daughter who helped her mother get around."

Ultimately, Casey's challenge to the restraining orders boils down to an argument that the court should have credited her testimony, rather than her mother's. We agree she provided a logical explanation for the transfer of the property, and in our view, this was an exceedingly close case even under the preponderance of the evidence standard. However, the question before us is not whether we would have reached a different conclusion had we been the triers of fact. Rather, our review is confined to whether any substantial evidence supports the trial court's findings, and in this regard it has often been said "[i]t is not our role to interfere with the trial court's assessment of the witnesses' demeanor and credibility." (*In re Naomi P.* (2005) 132 Cal.App.4th 808, 824.) "We review a cold record and, unlike a trial court, have no opportunity to observe the appearance and demeanor of the witnesses." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) We therefore must defer "to the trier of fact on such determinations, and ha[ve] no power to judge the effect or value of, or to weigh the evidence; to consider the credibility of witnesses; or to resolve conflicts in, or make inferences or deductions from the evidence." (*Ibid.*)

15

Accordingly, we affirm the restraining orders with one exception. As we shall explain in the next section of this opinion, the trial court did not have authority under section 15657.03 to issue a separate order declaring the deed from Bovis to Casey void ab initio. Accordingly, the court could not, under the express terms of the statute, issue a restraining order excluding Casey from the property as she was the record owner. (§ 15657.03, subd. (b)(5)(B) [court can issue restraining order "excluding a party from the petitioner's residence or dwelling, except that this order shall not be issued if legal or equitable title to . . . the residence or dwelling is in the sole name of the party to be excluded"].) The court did, however, have authority to issue an order requiring Casey to stay at least 100 yards from Bovis.

## Order Voiding Deed

Casey's challenge to the trial court's authority to issue the subsequent order declaring the deed void ab initio stands on different footing and presents an issue of statutory construction which we review de novo. (See *Cameron v. Las Orchidias Properties, LLC* (2022) 82 Cal.App.5th 481, 507– 508 (*Cameron*).)

### The Statutory Language

We first examine the plain language of the statute. (*Cameron, supra,* 82 Cal.App.5th at p. 508 [" ' "we look first to the words the Legislature used, giving them their usual and ordinary meaning" ' "]; *Mahan, supra,* 14 Cal.App.5th at p. 856 ["In construing the Elder Abuse Act, we begin with its words."].)

It is immediately apparent that the statute, titled "Protective orders" (§ 15657.03), speaks only of "protective orders," which are statutorily defined to mean "an order that includes any of the following restraining orders,

16

whether issued ex parte, after notice and hearing, or in a judgment."
(§ 15657.03, subd. (b)(5).)

These enumerated restraining orders include: (1) an order "enjoining a party from abusing, intimidating, molesting, attacking, striking, stalking, threatening, sexually assaulting, battering, harassing, telephoning, including, but not limited to, making annoying telephone calls as described in Section 653m of the Penal Code, destroying personal property, contacting, either directly or indirectly, by mail or otherwise, or coming within a specified distance of, or disturbing the peace of, the petitioner, and, in the discretion of the court, on a showing of good cause, of other named family or household members or a conservator, if any, of the petitioner"[11] (§ 15657.03, subd. (b)(5)(A)); (2) an order "excluding a party from the petitioner's residence or dwelling, except that this order shall not be issued if legal or equitable title to, or lease of, the residence or dwelling is in the sole name of the party to be excluded, or is in the name of the party to be excluded and any other party besides the petitioner (*id.*, subd. (b)(5)(B)); and (3) an order "enjoining a party from specified behavior that the court determines is necessary to effectuate orders described in subparagraph (A) or (B)" (*id.*, subd. (b)(5)(C)).[12]

---

[11] The court can also, "[o]n a showing of good cause, in an order issued pursuant to this subparagraph in connection with an animal owned, possessed, leased, kept, or held by the petitioner, or residing in the residence or household of the petitioner, . . . do either or both of the following: [¶] (i) Grant the petitioner exclusive care, possession, or control of the animal. [¶] (ii) Order the respondent to stay away from the animal and refrain from taking, transferring, encumbering, concealing, molesting, attacking, striking, threatening, harming, or otherwise disposing of the animal." (§ 15657.03, subd. (b)(5)(A)(i), (ii).)

[12] In addition, a court may, after notice and hearing, in conjunction with a restraining order for "abuse involving acts described in" section 15610.07, subdivision (a)(1) or (2), that is, for physical or emotional abuse or

17

The statute also authorizes two additional "restraining orders" which may be issued only after notice and a hearing: (1) an order "finding that specific debts were incurred as the result of financial abuse of the elder or dependent adult by the respondent" (§ 15657.03, subd. (b)(5)(D)); and (2) an "order enjoining a party from abusing an elder or dependent by isolating them"[13] (§ 15657.03, subd. (b)(5)(E)).

---

neglect, order the restrained party "to participate in mandatory clinical counseling or anger management." (§ 15657.03, subd. (z).)

[13] Such an order may issue "if the court finds by a preponderance of the evidence, to the satisfaction of the court, that the following requirements are met:

"(I) The respondent's past act or acts of isolation of the elder or dependent adult repeatedly prevented contact with the interested party.

"(II) The elder or dependent adult expressly desires contact with the interested party. A court shall use all means at its disposal to determine whether the elder or dependent adult desires contact with the person and has the capacity to consent to that contact.

"(III) The respondent's isolation of the elder or dependent adult from the interested party was not in response to an actual or threatened abuse of the elder or dependent adult by the interested party or the elder or dependent adult's desire not to have contact with the interested party.

"(ii) The order may specify the actions to be enjoined, including enjoining the respondent from preventing the interested party from in-person or remote online visits with the elder or dependent adult, including telephone and online contact.

"(iii) An order enjoining isolation under this section is not required for an elder or dependent adult to visit with anyone with whom the elder or dependent adult desires visitation.

"(iv) An order enjoining isolation shall not be issued under this section if the elder or dependent adult resides in a long-term care facility, as defined in Section 9701, or a residential facility, as defined in Section 1502 of the Health and Safety Code. In those cases, action may be taken under appropriate federal law." (§ 15657.03, subd. (b)(5)(E)(i)(I)–(III)(ii)–(iv).)

None of these enumerated—and carefully defined—restraining orders embrace an order declaring a document "void ab initio."

The procedural provisions of the statute underscore that section 15657.03 provides an important, but targeted, summary remedy to secure the immediate protection of an elder from any further act of abuse.

The statute specifies that "an order may be issued under this section, with or without notice, to restrain any person for the purpose of preventing a recurrence of abuse, if a declaration shows, to the satisfaction of the court, reasonable proof of a past act or acts of abuse."  (§ 15657.03, subd. (c).)

On the filing of a request for a protective order, the petitioner may request and obtain ex parte a temporary restraining order (TRO).  (§ 15657.03, subd. (d).)  A request for a "temporary restraining order without notice under this section shall be granted or denied on the same day that the petition is submitted to the court" unless the petition is submitted "too late in the day to permit effective review."  (*Id*., subd. (e).)  Within 21 days, or if good cause is shown 25 days, of the date of ruling on a request for a TRO, or of the date of filing the petition if no TRO is requested, "a hearing shall be held on the petition."  (*Id*., subd. (f).)

On "the filing of a petition for protective orders under this section, the respondent shall be personally served with a copy of the petition, notice of the hearing or order to show cause, temporary restraining order, if any, and any declarations in support of the petition.  Service shall be made at least five days before the hearing."  (§ 15657.03, subd. (k).)  The court at the request of the petitioner or on its own may shorten the time for service.  (*Ibid*.)  The notice "shall notify the respondent that if the respondent does not attend the hearing, the court may make orders against the respondent that could last up to five years."  (*Id*., subd. (l).)

19

"The respondent may file a response that explains or denies the alleged abuse." (§ 15657.03, subd. (g).) The respondent "shall be entitled, as a matter of course, to one continuance, for a reasonable period, to respond to the petition." (*Id.*, subd. (m).) Either party may request a continuance "which the court shall grant on a showing of good cause," or the court can grant a continuance on its own motion. (*Id.*, subd. (n)(1).) Parties may represent themselves or appear with counsel. (*Id.*, subd. (q).)

Upon notice and a hearing, the court may issue "any of the orders set forth in paragraph (5) of subdivision (b)." (§ 15657.03, subd. (h).) "In the discretion of the court, an order issued after notice and a hearing under this section may have a duration of not more than five years. . . . These orders may be renewed upon the request of a party, either for five years or permanently, without a showing of any further abuse since the issuance of the original order. . . . The request for renewal may be brought within the three months before the expiration of the order." (*Id.*, subd. (i)(1).) "The failure to state the expiration date on the face of the form creates an order with a duration of three years from the date of issuance." (*Id.*, subd. (i)(2).)

The information "on a protective order relating to elder or dependent adult abuse issued by a court pursuant to this section" must be transmitted to law enforcement, either the Department of Justice or a local law enforcement agency authorized by the Department of Justice to enter orders into the California Law Enforcement Telecommunications System (CLETS). (§ 15657.03, subd. (p)(1), (3)(A)–(B).) Unless the "protective order issued under this section was made solely on the basis of financial abuse or isolation unaccompanied by force, threat, harassment, intimidation, or any other form of abuse," the respondent is also subject to a mandatory firearms ban. (*Id.*, subd. (u)(4).)

20

The "prevailing party" in "an action brought under this section may be awarded court costs and attorney's fees, if any." (§ 15657.03, subd. (t).)

In sum, the entirety of section 15657.03 is focused on *restraining orders* to prevent *further* acts of abuse*,* and the statute sets forth a *summary* procedure to ensure the immediate protection of an elder.

The trial court's order declaring the deed void ab initio is at odds with the statutory language. For example, upon notice and a hearing, a trial court is authorized to issue "any of the orders *set forth in paragraph (5) of subdivision (b).*" (§ 15657.03, subd. (h), italics added.) The order declaring the deed void ab initio is not among the orders enumerated in subdivision (b)(5), all of which are specifically defined *restraining* orders.

The statute further specifies that "an order issued after notice and a hearing under this section may have a duration of not more than five years" and if no expiration date is set forth in the restraining order, its duration is three years. (§ 15657.03, subd. (i)(1), (2).) Thus, when issued, a restraining order is a provisional remedy akin to a preliminary injunction. It may, or may not, become permanent, depending on whether the protected party takes further action within three months of the expiration of the initial restraining order and the change of status is approved by the court. Here, the trial court specified the restraining orders had a two-year duration. The order declaring the deed void ab initio, in contrast, is a *permanent pronouncement* as to the validity and existence of the deed and, as such, cannot be squared with any of the durational provisions of the statute.[14]

---

[14] Although the trial court characterized its order as not an order requiring "rescission," but rather an order "that [Casey] return the property to Ms. Bovis" effectuated through a declaration "the transfer deed [is] void ab initio," the substance and practical effect of the order is a final judgment of rescission. (See generally Greenwald et al., Cal. Practice Guide: Real

### *The Relevant Legislative History*

The legislative history of the Elder Abuse Act, and section 15657.03 specifically, also makes clear this statute was enacted as an adjunct to the private civil actions for elder abuse already authorized by the Act to provide an immediate, ancillary remedy against any further act of abuse.

As the Court of Appeal explained in *Mahan*, "civil actions may be brought under the Act for ' "[p]hysical abuse" ' (§ 15610.63; see § 15657), '[n]eglect' (§ 15610.57; see § 15657), or ' "[f]inancial abuse" ' (§ 15610.30; see § 15657.5)." (*Mahan, supra*, 14 Cal.App.5th at p. 858.)  "To strengthen what had previously been a scheme relying on reporting by mandated reporters (Welf. & Inst. Code, former §§ 15620–15621, Stats. 1982, ch. 1184, § 3, pp. 4225–4226) and public enforcement by prosecutorial authorities, in 1991 the Legislature created a remedial scheme specifically for these private actions.  (Welf. & Inst. Code, §§ 15657 [physical abuse, neglect, abandonment], 15657.5 [financial elder abuse]." (*Royals v. Lu* (2022) 81 Cal.App.5th 328, 346 (*Royals*).)

"The template for private enforcement in cases involving physical abuse or neglect was set by the addition of section 15657." (*Mahan, supra,* 14 Cal.App.5th at p. 858.)  That statute has been amended "several times since then, but the core of it remains the same today.  It sets forth a scheme of heightened remedies—punitive damages (§ 15657, subd. (c)), attorney's fees and costs (*id.*, subd. (a)), and exemption from certain limitations on recoverable damages in survivorship actions (*id.*, subd. (b))—designed to

---

Property Transactions (The Rutter Group 2023) ¶ 11:460 ["Rescission is a remedy that *disaffirms* the contract (Civ. [Code,] § 1688 et seq.).  The remedy assumes the contract was properly formed, but effectively *extinguishes* the contract ab initio as though it never came into existence; and its terms cease to be enforceable."].)

provide incentives for 'interested persons to engage attorneys to take up the cause of abused elderly persons. . .' (§ 15600, subd. (j)).  These remedies are available only where the plaintiff proves by clear and convincing evidence that 'the defendant has been guilty of recklessness, oppression, fraud, or malice in the commission of this abuse.'  (§ 15657.)"[15]  (*Mahan, supra*, 14 Cal.App.5th at p. 858.)

In 1999, the Legislature added section 15657.03 to the Act.  The Assembly Committee on Aging and Long Term Care explained the need for this additional statute as follows: "In 1996, the court of appeals held that the Domestic Violence Prevention Act (DVPA) was not intended to extend its protections to unrelated persons living together who do not now, or have never shared an intimate relationship.  Historically, the DVPA was the legal tool used by Adult Protective Services to remove an abuser from the home of an elderly person.  The 1996 decision removed the ability to obtain a

---

[15]  A cause of action for elder abuse under the Act can be asserted in a civil complaint (e.g., *Cameron, supra,* 82 Cal.App.5th at p. 493 [complaint alleged causes of action for wrongful eviction and elder abuse]; *Munoz v. Patel* (2022) 81 Cal.App.5th 761, 765 [complaint alleged causes of action for breach of contract, breach of the covenant of good faith and fair dealing, promissory fraud, and elder abuse]; *Arace v. Medico Investments, LLC* (2020) 48 Cal.App.5th 977, 981 [complaint against care facility alleged causes of action for fraud, conversion, emotional distress, and elder abuse]) or in a petition in a probate proceeding (e.g., *Royals, supra*, 81 Cal.App.5th at pp. 336–337 [action by successor trustee of living trust]); *Levin v. Winston-Levin* (2019) 39 Cal.App.5th 1025, 1032 [probate petition for breach of contract, interference with expected inheritance, breach of fiduciary duty, and elder abuse]).  (See *Conservatorship of Kayle* (2005) 134 Cal.App.4th 1, 6–8 [probate court should have entertained motion to transfer elder abuse complaint seeking damages not available in conservatorship proceeding]; Balisok, Elder Abuse Litigation (The Rutter Group 2022 Update) Ch. 8, ¶¶ 8:12 to 8:17 [discussing litigating elder abuse claims in civil actions and probate proceedings].)  In elder abuse actions instituted pursuant to a civil complaint, either party may request a jury trial.  (CACI No. 3100 et seq.)

restraining order when an abuser is not related to the victim. Therefore, abusive roommates or caregivers cannot be forced to leave the home of the victim and to stay away. [¶] . . . This bill . . . sets forth procedures by which an elder or dependent adult who has suffered abuse may obtain protective orders against an unrelated person." (Assem. Com. on Aging and Long Term Care, Analysis of Assem. Bill No. 59 (1999–2000 Reg. Sess.) as amended Mar. 3, 1999, p. 2; see Sen. Com. on Judiciary, Analysis of Assem. Bill No. 59 (1999–2000 Reg. Sess.) as amended May 28, 1999, pp. 1–2 ["bill would authorize the issuance of emergency and other protective orders, similar to domestic violence protective orders, to prevent abuse of the elderly and dependent adults by unrelated roommates or housemates"; "[T]o breach a gap in the law covering harassment and domestic violence protective orders as they apply to the elderly and dependent adults . . . [¶] . . . the Committee's recommendation [during the prior session] was to create a separate procedure for issuance of protective orders for the elderly and dependent adults. AB 59 is the product of that recommendation."].) As enacted, section 15657.03 authorized only the restraining orders now set forth in subdivisions (b)(5)(A) through (C). (See Stats. 1999, ch. 561, § 6.)

"In 2004, the Legislature 'created a new class of claims for "financial abuse," enacting a private enforcement provision—[Welfare and Intuitions Code] section 15657.5—tailored to these claims in particular. [Welfare and Institutions Code] [s]ection 15657.5 sets forth a scheme of heightened remedies closely paralleling those available under [Welfare and Institutions Code] section 15657, but with some key differences, principally that attorney's fee and cost awards are available for "financial abuse" claims proved by the preponderance of the evidence, while clear and convincing evidence remains the standard applicable to fee and cost recovery for claims

of "physical abuse" or "neglect." ' (*Mahan, supra*, 14 Cal.App.4th at p. 859, fns. omitted.)" (*Royals, supra*, 81 Cal.App.5th at p. 347.) The standard of proof for recovering punitive damages remains "clear and convincing evidence of recklessness, oppression, fraud, or malice. (See Welf. & Inst. Code, § 15657.5, subds. (c), (d).)" (*Ibid.*)

Three years later, in 2007, the Legislature, " 'made available the remedy of prejudgment attachment as a way to facilitate quick recovery of losses in "financial abuse" cases ([Welf. & Inst. Code,] § 15657.01).' "[16] (*Royals, supra* 81 Cal.App.5th at p. 347.) Its purpose in doing so was to help claimants " 'preserve the elder or dependent adult's assets wrongfully held by defendant until judgment is rendered.' (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 611 (2007–2008 Reg. Sess.) as amended Mar. 26, 2007, p. 4; see Assem. Com. on Judiciary, Analysis of Senate Bill No. 611 (2007–2008 Reg. Sess.) as amended May 31, 2007, p. 4 ['The attachment procedure is a useful tool to prohibit the perpetrator from disposing of the elder or dependent adult's assets in his or her possession prior to final disposition of the case.'].)" (*Royals,* at p. 347; see Balisok, Elder Abuse Litigation, *supra,* ch. 8, ¶¶ 8:29 to 8:38 [discussing the importance of attachment to assure recovery of property in elder abuse cases].)

---

[16] This statute provides: "Notwithstanding Section 483.010 of the Code of Civil Procedure, an attachment may be issued in any action for damages pursuant to Section 15657.5 for financial abuse of an elder or dependent adult, as defined in Section 15610.30. The other provisions of the Code of Civil Procedure not inconsistent with this article shall govern the issuance of an attachment pursuant to this section. In an application for a writ of attachment, the claimant shall refer to this section. An attachment may be issued pursuant to this section whether or not other forms of relief are demanded." (§ 15657.01.)

The following year, the Legislature passed further legislation enhancing the ability of elders subject to financial abuse to recover their property. Among other things, this 2008 legislation (1) redefined what it means to take property for a "wrongful use," replacing the prior requirement that "bad faith" be shown with a standard based on whether the defendant "knew or should have known" of "likely" harm to the elder (§ 15610.30, subd. (b)); (2) redefined the phrase "takes, secretes, appropriates, obtains, or retains" so that any "depriv[ation]" of property is subject to liability, including "by means of an agreement, donative transfer, or testamentary bequest, regardless of whether the property is held directly" by the elder or on his behalf by a third-party (*id.*, subd. (c)); (3) created a new basis for liability, adding "depriv[ation]" of property by "undue influence" (*id.*, subd. (a)(3)) as a "new cause of action" separate from "depriv[ation]" "for wrongful use or with intent to defraud" (*id.*, subd. (a)(1)–(2)); and (4) added a new "cause of action for financial abuse against a person who takes the property of an elder or dependent adult who lacks capacity and then refuses to return the property after a demand for return of the property was made by the elder or dependent adult." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Mar. 10, 2008, p. 1; § 15657.6; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Jun. 2, 2008, pp. 1–2.)

As reported by the Assembly Committee on Judiciary, "The author states that incapacitated and unduly influenced elder and dependent adults are devastated by the loss of property taken from them and this bill seeks to prevent or minimize that abuse by authorizing elder and dependent adults to recover attorney's fees where their property is taken through undue influence or where a person delays returning property taken from an incapacitated

26

adult." (Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Jun. 2, 2008, p. 1, italics omitted.)

The Senate Judiciary Committee Report explained that "existing law" permitted "an elder or dependent adult to bring a financial abuse civil action when real or personal property [has been] taken or appropriated . . . for wrongful use or with intent to defraud, or both," referencing section 15657.5.[17] (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Mar. 10, 2008, p. 3; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Jun. 2, 2008, p. 3 [under the existing Act "an elder or dependent adult whose property is wrongfully taken by another may bring a civil action for financial abuse to recover the loss of the property and the expense of hiring an attorney to bring the action"].)

However, the existing definitions of "financial abuse" and "wrongful use" did not extend to all abusive contexts and in such cases elders and dependent adults had recourse only through a traditional action for recission which does not carry with it the incentives for private suit provided by the Elder Abuse Act. The new, more inclusive definition of "financial abuse" and the replacement of the "wrongful use" terminology harnessed these incentives to pursue civil litigation under the Act. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Mar. 10, 2008, p. 6 ["recission, according to proponents, is an inadequate remedy for elders because not only must the elder bear the attorney's fees in pursuing a recission action" but "the person who took the property is encouraged to delay

_____

[17] Section 15657.5, titled "Defendant liable for financial abuse; attorney's fees and costs; limits on damages; punitive damages; statement to be included in judgment," sets forth the enhanced remedies and other incentives to redress elder abuse through private civil actions.

27

resolution so as to promote a compromise settlement"]; *id.*, p. 7 [the proposed legislation "addresses these problems by authorizing elders or dependent adults to recover attorney's fees and costs where their property is taken through undue influence or where the person taking the property delays the return of the property"]; see Assem. Com. on Judiciary, Analysis Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Jun. 2, 2008, p. 3 [legislation "seeks to strengthen" the Act]; *id.*, p. 4 ["[p]roponents" argue "elders are often exploited through undue influence and under circumstances where the current elements necessary for financial abuse are lacking"], *ibid.* [legislation addresses problems inherent in elders seeking return of their property through a recission action by authorizing the recovery of attorney's fee and costs]; Off. of Planning and Research, Enrolled Bill Rep. on Sen. Bill No. 1140 (2007–2008 Reg. Sess.) Aug. 13, 2008, p. 4 [discussing the problems in seeking the recovery of property through traditional rescission actions].)

The Senate Judiciary Committee analysis further explained the proposed legislation, through enactment of a new statute—section 15657.6 titled "Return of property to elder or dependent adult lacking capacity"[18]—

---

[18] This statute provides: "A person or entity that takes, secretes, appropriates, obtains, or retains, or assists in taking, secreting, appropriating, obtaining, or retaining the real or personal property of an elder or dependent adult when the elder or dependent adult lacks capacity pursuant to Section 812 of the Probate Code, or is of unsound mind, but not entirely without understanding, pursuant to Section 39 of the Civil Code, shall, upon demand by the elder or dependent adult or a representative of the elder or dependent adult, as defined in subdivision (d) of Section 15610.30, return the property and if that person or entity fails to return the property, the elder or dependent adult shall be entitled to the remedies provided by Section 15657.5, including attorney's fees and costs. This section shall not apply to any agreement entered into by an elder or dependent adult when the elder or dependent adult had capacity." (§ 15657.6.)

would also "require the person who takes, secretes, appropriates, obtains or retains real or personal property of an elder or dependent adult who lacks capacity . . . to return the property upon demand." (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended on Mar. 10, 2008, p. 3.) This new statute additionally included an enforcement mechanism, specifically "a new civil cause of action for an elder or dependent adult who lacks capacity to recover . . . property that was not returned after a demand" that affords "all the remedies available under [the Act], including attorney's fees." (*Ibid.*; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended on Jun. 2, 2008, p. 4 ["bill provides a new remedy when an elder or dependent lacks capacity—return the property to avoid attorney's fees," (underscoring omitted)].) The requirement that a demand first be made would give a party who did not know the elder or dependent lacked capacity at the time, the opportunity to return the property. The elder or dependent would thereby quickly recover his or her property, and the party who took or removed it from the elder or dependent would avoid liability for the elder's or dependent's attorney's fee and court costs. (Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended on Mar. 10, 2008, p. 7; Assem. Com. on Judiciary, Analysis of Sen. Bill No. 1140 (2007–2008 Reg. Sess.) as amended Jun. 2, 2008, p. 4; Off. of Planning and Research, Enrolled Bill Rep. on Sen. Bill No. 1140 (2007–2007 Reg. Sess.) Aug. 13, 2008, pp. 4–5.)

In 2021, in the midst of, and because of, the COVID-19 pandemic, the Legislature amended section 15657.03, adding the restraining orders authorized in subdivisions (b)(5)(D) pertaining to findings that "specific debts" were incurred due to financial elder abuse and (b)(5)(E) prohibiting the

29

isolation of elders.  (2021 Stats. ch. 273, § 3 (Assem. Bill No. 1243).)[19]  The legislative history recites that the Elder Abuse Act "[p]ermits an elder or dependent adult to bring a financial abuse civil action when real or personal property is taken or appropriated from the elder or dependent adult for a wrongful use or with intent to defraud, or both," citing *section 15657.5*. (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) as amended Apr. 28, 2021, p. 4.)  It further recites the Act also "[a]llows an elder or dependent adult who has suffered abuse to seek a protective order," citing *section 15657.03*.  (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) as amended Apr. 28, 2021, p. 4.)

The reported purpose of the amendment with respect to isolation was explained as follows: "Due to the ongoing COVID-19 pandemic, visitation to vulnerable groups including elderly individuals has been limited to prevent/minimize exposure to the virus.  For many families caring for relatives in [the] community this meant little or no visitation outside of primary caregivers.  AB 1243 helps prevent isolation of vulnerable Californians by allowing family members or other persons with a pre-existing relationship (as defined in the bill language) to petition the court through the existing elder and dependent adult abuse restraining order process for orders enjoining the isolation and allowing contact . . . as long as the elder or dependent adult wants that contact."  (Assem. Com. on Judiciary, Analysis. of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) as amended Apr. 28, 2021, p. 5,

---

[19]  Technically, the legislation ultimately repealed and enacted a revised version of the statute.  (Legis. Counsel's Dig. of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) ["An act to amend, repeal, and add section 15657.03 of the Welfare and Institutions Code, relating to protective orders."  (Italics omitted.)], approved by the Governor on Sept. 23, 2021.)

boldface omitted; see Sen. Rules Com., 3d reading Analysis of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) as amended Aug. 26, 2021, p. 3 ["The pandemic and resulting stay-at-home orders, as well as older adults' vulnerability to COVID-19, have amplified the need for additional protections, as well as creative ways to ensure older adults remain connected to their communities."].)

With respect to financial abuse/specific debt findings, the reported purpose was to "provide[] an additional elder and dependent adult abuse restraining order . . . to allow judges issuing elder and dependent adult restraining orders to make . . . findings that specific debts are the result of coerced debt. This will give the protected party an additional tool to use when facing collection activity by creditors and collectors. They can use the coerced debt findings to dispute debts with creditors, collectors, and/or credit reporting agencies, which will protect their future income and facilitate their economic recovery." (Assem. Com. on Judiciary, Analysis of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) as amended Apr. 28, 2021, p. 5; *id.*, at p. 8 ["Used together with the relief provided to victims of identity theft in Civil Code Section 1798.93, this should help protect elder or dependent adult abuse victims from third parties who go after them to collect on debt that was unlawfully established in their name."].) Such a finding, however, would "not affect the priority of any lien or other security interest" and would "not entitle the petitioner to any remedies *other than those actually set forth in the protective order statute.*"[20] (Assem. Com. on Judiciary, Analysis of Assem.

_____

[20] Thus, the statutory language expressly states, "The finding pursuant to clause (i) [of a specific debt incurred due to elder financial abuse] shall not entitle the petitioner to any remedies other than those actually set forth in this section. The finding pursuant to clause (i) shall not affect the

31

Bill No. 1243 (2021–2022 Reg. Sess.) as amended Apr. 28, 2021, at p. 8, italics added; see Sen. Rules Com., 3d reading Analysis of Assem. Bill No. 1243 (2021–2022 Reg. Sess.) as amended Aug. 26, 2021, p. 4.)

The legislative history recounted above reinforces what is evident from the plain language of section 15657.03—that it serves a specific purpose and provides a specific ancillary remedy, namely restraining orders of specified duration to secure the immediate safety of an elder from any further act of abuse. The statute does not supplant the other provisions of the Elder Abuse Act that authorize and encourage private civil actions wherein a full array of permanent remedies, including declaratory and injunctive relief, are available. (See *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 155–156 (*Winn*) [in addition to the ordinary meaning of the statutory language, we consider "its relationship to the text of related provisions, terms used elsewhere in the statute, and the overarching structure of the statutory scheme"]; see also Balisok, Elder Abuse Litigation, *supra,* ¶8:43 ["Among the specific [restraining] orders available [under section 15657.03] are orders to prevent the destruction of personal property [citation]. . . . The balance of the protective orders available under this section provide for physical and emotional security of the elder or dependent adult, but not direct assistance in the recovery or preservation of property."].)

This history also makes clear that when the Legislature has deemed it necessary to authorize additional remedies, including, for example, to facilitate the return of real property, it knows how to do so, and, in fact, has done so through the enactment of *other* statutory provisions, such as section 15657.01 authorizing attachment and section 15657.6 establishing a new

priority of any lien or other security interest." (§ 15657.03, subd. (b)(5)(D)(ii).)

32

elder abuse cause of action for failure to return misappropriated property on the demand of an elder who, at the time, "lack[ed] capacity." (See *Winn, supra,* 63 Cal.4th at p. 159 ["In construing statutes, we bear in mind that the scope of certain terms may sometimes be elucidated by related provisions."].)

It is additionally apparent from this history that when it passed the 2008 amendments facilitating the return of property, the Legislature understood that an elder's misappropriated property was recoverable through a *civil action* under the Act, but only when the definitional provisions of "financial abuse" then in effect were met. Otherwise, the elder had to pursue a traditional recission action. The amendments rectified the limitations of a traditional rescission action with respect to financially abused elders by enhancing the Act's provisions pertinent to *civil actions.* Nowhere in the legislative history of these amendments is there any mention of section 15657.03 even though that statute had been in place for nearly 10 years, let alone any suggestion that through the summary protective order process authorized by that statute the trial courts were already authorized to issue, as the trial court did here, what for all intents and purposes is a final judgment of rescission.

In sum, the legislative history reinforces the plain language of the statute—that courts may, pursuant to the summary procedure set forth in section 15657.03, issue any of the specified restraining orders to secure, for a specified period of time not to exceed five years, the immediate safety of an elder and prohibit any further act of abuse. Other permanent remedies, when necessary, including for the return of property, may be secured through a civil action under other provisions of the Act.

In an effort to invoke provisions of the Act other than section 15657.03, Bovis points to section 15657.6 (added by the 2008 amendments) and argues

the facts on which the trial court based its "undue influence" finding and issued restraining orders also establish that she "lacked capacity" when she executed the deed and therefore the court was authorized to order the return of the property. To begin with, as we have explained, section 15657.6 was not enacted to expand the trial courts' authority to issue restraining orders under section 15657.03. Rather, section 15657.6 was enacted as part of an expansion of civil proceedings under *other* provisions of the Act to facilitate the recovery of property, including by establishing a new species of elder abuse claim for failure to return property misappropriated from an elder lacking capacity. Furthermore, while Bovis claimed in her "Request for Elder or Dependent Adult Abuse Restraining Orders" that she had been subject to "undue influence," she did not claim that she "lacked capacity" and was entitled to the return of the property under section 15657.6. Accordingly, the trial court never cited to section 15657.6 nor made any "lack of capacity" finding thereunder.

## DISPOSITION

The elder abuse restraining order stay-away order barring Casey from the property on which Bovis resided is REVERSED; in all other respects, the restraining orders set forth in the court's form order filed April 13, 2022, are AFFIRMED. The "Order To Void Transfer Deed Ab Initio" filed May 12, 2022, is REVERSED. Parties to bear their own costs on appeal.

34

_____

Banke, J.

We concur:

_____

Humes, P.J.

_____

Castro, J.*

**Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A165210, Bovis v. Casey

Trial Court: San Mateo County Superior Court

Trial Judge:        Hon.  Lisa A. Novak

Counsel:

Law Office of Joe Goethals, Joseph Michael Goethals; Moskovitz Appellate Team, Myron Moskovitz for Plaintiff and Respondent.

Thompson, Welch, Soroko & Gilbert, Eric D. McFarland for Defendant and Appellant.